# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

GALDERMA LABORATORIES, §
L.P., GALDERMA S.A., and §
GALDERMA RESEARCH & §
DEVELOPMENT, S.N.C., §
§ No. 3:12-cv-2038-K
*Plaintiffs*, §
§
v. §
§
ACTAVIS MID ATLANTIC LLC, §
§
*Defendant*. §

## MEMORANDUM OPINION AND ORDER

Before the Court is Plaintiffs Galderma Laboratories, L.P., Galderma S.A., and

Galderma Research & Development, S.N.C.'s (collectively "Galderma") Motion to

Disqualify Vinson & Elkins, LLP (Doc. No. 18). The Court conducted a hearing on

this motion on October 28, 2012. The Court has reviewed the motion, the parties'

briefs, the appendices and supplemental appendices. Additionally, the Court has

reviewed the Executive Summaries filed by each party (Docs. No. 54 & 55), has

considered the parties' arguments at the hearing on October 28, 2012, and the

applicable law. The Court **DENIES** Galderma's Motion (Doc. No. 18) because

Galderma gave informed consent to Vinson & Elkins's ("V&E") representation of

clients directly adverse to Galderma in matters that are not substantially related to

V&E's representation of Galderma.

## I.    Factual Background

Galderma is a worldwide leader in the research, development, and manufacturing of branded dermatological products.  Galderma is headquartered in Fort Worth where it employs approximately 240 people.  Galderma and its affiliates have operations around the world, employing thousands of people and reporting worldwide sales of 1.4 billion euros for the year 2011 alone.

As a complex, global company, Galderma routinely encounters legal issues and the legal system.  Galderma has its own legal department to address these issues.  The legal department is headed by its Vice President and General Counsel, Quinton Cassady.  Mr. Cassady is a lawyer who has practiced law for over 20 years and has been general counsel for Galderma for over 10 of those years.  In addition to an in-house legal department, Galderma, through Mr. Cassady, frequently engages outside counsel to assist with a wide range of issues.  Over the past 10 years, Galderma has been represented by large law firms including DLA Piper, Paul Hastings, and Vinson & Elkins, LLP ("V&E").  Galderma also engages smaller law firms as needed.

In 2003, Galderma and V&E began its attorney-client relationship.  V&E sent Galderma an engagement letter.  As part of the engagement letter, V&E sought Galderma's consent to broadly waive future conflicts of interest, subject to specific limitations identified in the engagement letter.  The waiver contained in the engagement letter is as follows:

> We understand and agree that this is not an exclusive agreement, and you are free to retain any other counsel of your choosing.  We recognize

that we shall be disqualified from representing any other client with interest materially and directly adverse to yours (i) in any matter which is substantially related to our representation of you and (ii) with respect to any matter where there is a reasonable probability that confidential information you furnished to us could be used to your disadvantage. You understand and agree that, with those exceptions, we are free to represent other clients, including clients whose interests may conflict with ours in litigation, business transactions, or other legal matters. You agree that our representing you in this matter will not prevent or disqualify us from representing clients adverse to you in other matters and that you consent in advance to our undertaking such adverse representations.

On behalf of Galderma, Mr. Cassady signed that he understood and, on behalf of Galderma, agreed to the terms and conditions of engaging V&E, including the waiver of future conflicts of interest.

Beginning in 2003, Galderma engaged V&E for legal advice relating to employee benefit plans, Galderma's 401(k) plan, health care benefit programs, employment issues, and other issues relating to the administration of such programs. V&E continued to advise Galderma on employment and benefits issues into July of 2012.

In June 2012, while V&E was advising Galderma on employment issues, Galderma, represented by DLA Piper and Munck Wilson Mandala, filed this intellectual property lawsuit against Actavis Mid Atlantic, LLC ("Actavis"). At that time, V&E had already represented various Actavis entities in intellectual property matters for six years. Without any additional communication to Galderma, V&E began working on this matter for Actavis, and in July 2012, V&E filed Actavis's answer and counterclaims.

In July 2012, Galderma received a copy of Actavis's answer and counterclaims, and became aware that V&E was representing Actavis. After brief discussions in late July between Mr. Cassady and V&E, Galderma asked V&E to withdraw from representing Actavis. On August 6, 2012, V&E chose to terminate its attorney-client relationship with Galderma rather than Actavis. On that same day, V&E stated that it would not withdraw from representing Actavis, because Galderma had consented to V&E representing adverse parties in litigation when it signed the waiver of future conflicts in the 2003 engagement letter. Galderma then brought this motion to disqualify.

## II.    Galderma's Motion to Disqualify

Galderma now moves to disqualify V&E from representing Actavis in the underlying patent litigation. The briefing of the parties has been wide-ranging, but at oral arguments, counsel acknowledged that the crux of the issue is this: whether or not Galderama, a sophisticated client, represented by in-house counsel gave informed consent when it agreed to a general, open-ended waiver of future conflicts of interest in V&E's 2003 engagement letter. Galderma argues that its consent was not "informed consent" when its own, in-house lawyer signed the agreement on its behalf because V&E did not advise Galderma of any specifics with regards to what future conflicts Galderma may be waiving. V&E argues that in this case, because Galderma is a highly sophisticated client who is a regular user of legal services and was represented by its own counsel, the waiver language is reasonably adequate to advise

Galderma of the material risks of waiving future conflicts, despite being general and open-ended.

A.      **Legal Framework for Resolving Ethics Questions**

Fifth Circuit precedent requires the court to consider several relevant ethical standards in determining whether there has been an ethical violation. Disqualification cases are guided by state and national ethical standards adopted by the Fifth Circuit. *In re American Airlines*, 972 F.2d 605, 610 (5th Cir. 1992). In the Fifth Circuit, the source for the standards of the profession has been the canons of ethics developed by the American Bar Association. *In re Dresser*, 972 F.2d at 543. Additionally, consideration of the Texas Disciplinary Rules of Professional Conduct is also necessary, because they govern attorneys practicing in Texas generally. *See FDIC v. U.S. Fire Ins. Co.*, 50 F.3d 1304, 1312 (5th Cir. 1995). The Court also considers, when applicable, local rules promulgated by the local court itself. *Id.* Because motions to disqualify are substantive motions, which affect the rights of the parties, a party cannot be deprived of its right to counsel on the basis of local rules alone. *In re Dresser*, 972 F.2d at 543.

The Court must give careful consideration to motions to disqualify because of the potential for abuse. Disqualification motions may be used as "procedural weapons" to advance purely tactical purposes. *In re American Airlines, Inc.*, 972 F.2d at 611. A disqualification inquiry, particularly when instigated by an opponent, presents a palpable risk of unfairly denying a party the counsel of his choosing. *U.S.*

*Fire Ins. Co.*, 50 F.3d at 1316.  When the Model Rules are invoked as procedural weapons, the party subverts the purpose of the ethical rules.  MODEL RULES OF PROF'L CONDUCT, Scope, cmt. 20 (2010).

When a client hires multiple firms, that creates inadvertent problems for the ethical system in at least two ways.  One is when the client hires every large and small firm possible to prevent any local firm from being on the other side.  The second problem happens in cases such as this, where a client hires a firm for work that is important, but small in size compared to some unrelated large matters.   The ABA recognized this problem may occur:

> When corporate clients with multiple operating divisions hire tens if not hundreds of law firms, the idea that, for example, a corporation in Miami retaining the Florida office of a national law firm to negotiate a lease should preclude that firm's New York office from taking an adverse position in a totally unrelated commercial dispute against another division of the same corporation strikes some as placing unreasonable limitations on the opportunities of both clients and lawyers.  ABA Comm. on Ethics & Prof'l Responsibility, Formal Op. 93-372 (1993) (withdrawn by ABA Comm. on Ethics & Prof'l Responsibility, Formal Op. 05-436 (2005)).

Sophisticated clients can retain their adversary's counsel of choice in unrelated matters while attempting to invalidate prospective waivers of future conflicts when that counsel later becomes adverse to them.  Large firms would never be able to take on small, specialized matters for a client unless the firms could reasonably protect against this potential abuse by preserving their ability to practice in other areas where the client has chosen to retain different counsel.

**B.    Ethical Standards for Waiver of Future Conflicts**

With the ABA canons of ethics as a guide, informed by state and local rules, the Court considers the ethical standards relevant to this specific case.

As a general rule, a lawyer is not allowed to sue his own client, which he concurrently represents in other matters. *In re Dresser*, 972 F.2d at 540. This holding mirrors the position of the ABA Model Rules of Professional Conduct ("Model rules"), which provide that, "[e]xcept as provided in paragraph (b) a lawyer shall not represent a client if the representation involves a concurrent conflict of interest." MODEL RULES OF PROF'L CONDUCT R. 1.7 (2010). Rule 1.7(b) creates an exception.

> Notwithstanding the existence of a concurrent conflict of interest under paragraph (a), a lawyer may represent a client if:
> (1) the lawyer reasonably believes that the lawyer will be able to provide competent and diligent representation to each affected client;
> (2) the representation is not prohibited by law;
> (3) the representation does not involve the assertion of a claim by one client against another client represented by the lawyer in the same litigation or other proceeding before a tribunal; and
> (4) each affected client gives informed consent, confirmed in writing.
> *Id.* R. 1.7(b).

"Informed consent" denotes the agreement by a person to a proposed course of conduct after the lawyer has communicated adequate information and explanation about the material risks of and reasonably available alternatives to the proposed course of conduct. *Id.* R. 1.0(e).

No Northern District rule speaks directly to the issues raised in this case – informed consent and unrelated conflicts of interest pertaining to current clients. Local rules do require that all lawyers who practice before the

Northern District of Texas follow the Texas Disciplinary Rules of Professional Conduct. Loc. R. 83.8(e). The Texas rule on conflicts of interest involving current clients is more lenient than the Model Rules. *See* Tex. Disciplinary Rules Prof'l Conduct R. 1.06 *reprinted in* Tex. Gov't Code Ann., tit. 2, subtit. G, app. A (West 2005). That rule permits representing clients against current clients so long as the two matters are not substantially related or reasonably appears to be or become adversely limited. *Id.* Under the Texas rule, there is no need for informed consent. *See id.* A lawyer representing an enterprise with diverse operations may accept employment as an advocate against the enterprise in a matter unrelated to any matter being handled for the enterprise. *Id.*, Cmt 11.

In a past case, the Fifth Circuit noted that the dissimilar, arguably contradictory standards set by the Model Rules and the Texas Rules requires a court to weigh the relative merits of each of the various competing disqualification rules as the court proceeds through each step of the analysis. *US Fire Ins. Co.*, 50 F.3d at 1312. Unlike *US Fire Ins. Co.*, it is undisputed that there is a conflict of interest. The difference between the Model Rule and the Texas Rule goes to the central issue in this case, the need for informed consent. To give weight to the Texas Rule over the Model Rule in this case would vitiate the cornerstone of the national standard, the requirement of informed consent. Thus, while the Court has considered the applicable Texas Rules, the Model

Rules and authority related to them must control in determining Galderma's motion to disqualify. *See In re Dresser*, 972 F.2d at 543–45 (reversing the district court for applying Texas Disciplinary Rules instead of the more restrictive national standards).

Under the Model Rules, a client's waiver of future conflicts is valid when the client gives informed consent. MODEL RULES OF PROF'L CONDUCT R. 1.7(b) (2010). Clearly, all clients, even the most sophisticated, must give informed consent. *Id.* What disclosure from an attorney is reasonably adequate to allow for informed consent for a particular client is not clear. The Model Rules, the Comments to the Model Rules, and the Formal Opinions of the ABA's Committee on Ethics and Professional Responsibility outline a number of factors for courts to consider in determining whether a client has given informed consent to waive future conflicts of interest.

### 1.    ABA Model Rules and Applicable Comments

One source for determining how to apply the Model Rules is the comments to the Model Rules. The comments do not add obligations to the Model Rules but provide guidance for practicing in compliance with the Rules. *Id.* Preamble, cmt. 14. The text of each Rule is authoritative, but the Comments are intended as guides to interpretation. *Id.* Preamble, cmt. 21.

The Comments to Rule 1.7, governing current client conflicts, recognize that a lawyer may properly request a client to waive future conflicts, subject to

the test in Rule 1.7(b).  *Id.* 1.7, cmt. 22.  The effectiveness of the waiver is generally determined by the extent to which the client reasonably understands the material risk that the waiver entails.  *Id.*

When dealing with a waiver of future conflicts, a specific waiver of a particular type of conflict has the greatest likelihood of being effective.  *Id.*  A general and open-ended waiver will ordinarily be ineffective, because the client will likely not have understood the material risks involved.  *Id.*  Consent using a general or open-ended waiver is not per se ineffective, but considering the entire spectrum of clients, a general and open-ended waiver is likely to be ineffective because the vast majority of clients are not in a position to understand the material risks from the open-ended language of the waiver itself.

The same comment highlights that consent to a general, open-ended waiver is more likely to be effective when dealing with a narrow set of circumstances.  If the client is an experienced user of the legal services involved and is reasonably informed regarding the risk that a conflict may arise, that consent is more likely to be effective.  *Id.*  The consent is particularly likely to be effective when the client is independently represented by other counsel in giving consent and the consent is limited to future conflicts unrelated to the subject of the representation.  *Id.*

The comments to Rule 1.0, which defines "informed consent," mirror the comments to Rule 1.7. For consent to be "informed," the lawyer must take reasonable steps to ensure that the client or other person possesses information reasonably adequate to make an informed decision. *Id.* R. 1.0, cmt. 6. Ordinarily, this requires communication that includes a disclosure of the facts and circumstances giving rise to the situation, any explanation reasonably necessary to inform the client or other person of the material advantages and disadvantages of the proposed course of conduct and a discussion of the client's or other person's options and alternatives. *Id.* The more experienced the client is in legal matters generally and in making decisions of the type involved, the less information and explanation is needed for a client's consent to be informed. *Id.* When dealing with a client who is independently represented by other counsel in giving the consent, generally the client should be assumed to have given informed consent. *Id.* Just like Rule 1.7, Rule 1.0 shows there is a vast difference in what type of disclosure is necessary to ensure that a client has reasonably adequate information to make an informed decision, depending on the sophistication of the client and, importantly, whether or not the client is represented by an independent lawyer.

### 2. ABA Committee on Ethics and Professional Responsibility Formal Ethics Opinions

The ABA's Standing Committee on Ethics and Professional Responsibility has also issued a formal ethics opinion dealing expressly with

informed consent to future conflicts. ABA Comm. on Ethics & Prof'l

Responsibility, Formal Op. 05-436 (2005) [hereinafter ABA Formal Op. 05-

436]. As amended in February 2002, Rule 1.7 permits a lawyer to obtain

effective informed consent to a wider range of future conflicts than would have

been possible under the Model Rules prior to their amendment. *Id.* Prior to

the 2002 Amendment of the Model Rules, informed consent was limited to

circumstances in which the lawyer was able to and did identify the potential

party or class of parties that may be represented in the future matter. *Id.*; ABA

Comm. on Ethics & Prof'l Responsibility, Formal Op. 93-372 (1993)

(withdrawn) [hereinafter ABA Formal Op. 93-372]. Additionally, informed

consent may have been limited further by the need to identify the nature of

the likely future matter. ABA Formal Op. 05-436; ABA Formal Op. 93-372.

Relying on Comment 22, the Committee opined that, following the

amendment, open-ended, general informed consent was likely to be valid if the

client is an experienced user of legal services. ABA Formal Op. 05-436. The

opinion gave significant weight to the sophistication of the client and its use of

independent counsel, factors which previously had not been relevant to

informed consent. *See* ABA Formal Op. 05-436 (Opinion 93-372 does not

vary its conclusions as to the likely effectiveness of informed consent to future

conflicts when the client is an experienced user of legal services or has had the

opportunity to be represented by independent counsel in relation to such

consent).  The Committee concluded that because Comment 22 supported the validity of a general, open-ended waiver in particular circumstances, the limits on effective consent established in ABA Formal Opinion 93-372 were no longer consistent with the Model Rules.  ABA Formal Op. 05-436.

### C.      Burden of Proof

On a motion to disqualify, the movant bears the ultimate burden of proof.  Galderma must establish that there is a conflict of interest under the applicable ethics standards and if so, that disqualification is the proper remedy. *See Forsyth v. Barr*, 19 F.3d 1527, 1546 (placing the burden of establishing a conflict on the client seeking disqualification).  V&E does not dispute the concurrent representation of Galderma and Actavis establishes a conflict of interest under the Model Rules.  V&E argues that Galderma gave informed consent for V&E to represent clients adverse to it in litigation, which waives any right to claim a conflict of interest.  Absent informed consent, there is no question that V&E's contemporaneous representation of Actavis and Galderma is a current client conflict on an unrelated matter.  *See In re Dresser*, 972 F.2d at 545; Model Rules of Prof'l Conduct R. 1.7 (2010).

With regards to allocating the burden of proof, the issue of "informed consent" is similar to the issue of exceptional circumstances that the court addressed in *In re Dresser*.  *See In re Dresser*, 972 F.2d at 545.  On the issue of exceptional circumstances, the court noted that it would be the attorney's

burden to show a reason why the court should allow the otherwise impermissible dual representation. *Id.* Other courts considering informed consent in this context have also concluded that shifting the burden is appropriate, so that the attorney bears the burden of showing informed consent. *See Celgene Corp. v. KV Pharmaceutical Co.*, No. 07-4819, 2008 WL 2937415, at *6 (D.N.J. July 29, 2008); *El Camino Res., Ltd. V. Huntington Nat'l Bank*, 623 F. Supp. 2d 863, 869 (W.D. Mich. 2007). Because, absent informed consent, there is no question that V&E's contemporaneous representation of Actavis and Galderma is a current client conflict on an unrelated matter, Galderma need prove nothing more to establish a violation of Model Rule 1.7. V&E has raised the issue of informed consent in response to the otherwise established violation. Because V&E has raised the issue in its defense, the Court concludes that V&E has the burden to show that Galderma gave informed consent. Because the Court concludes that Galderma gave informed consent, the Court need not address whether Galderma has proved that disqualification of V&E is warranted.

### D. Whether or Not Galderma Gave Informed Consent to the Waiver of Future Conflicts

To meet its burden of showing informed consent, V&E must show that it provided reasonably adequate information for Galderma to understand the material risks of waiving future conflicts of interest. MODEL RULES OF PROF'L CONDUCT R. 1.0, cmt. 6 (2010). Two related questions in this test form the analysis. The first

14

question is whether the information disclosed is reasonably adequate for a client to form informed consent. If the waiver does, the second question is, whether or not the disclosure is reasonably adequate for the particular client involved in this case. The focus of the first question is on what information is being disclosed, and the focus of the second question is on circumstances pertaining to the client.

### 1. Whether V&E's Disclosure Is Reasonably Adequate for a Client to Form Informed Consent

Rule 1.0 provides three basic factors to help determine whether a disclosure is reasonably adequate to allow for informed consent. *See id*, 1.0(e). Rule 1.0(e) identifies that informed consent is characterized by: 1) agreement to a proposed course of conduct, 2) after the lawyer has communicated adequate information and explanation about the material risks, and 3) the lawyer has proposed reasonably available alternatives to the proposed course of conduct. *Id.* The language of the agreement is a primary source for determining whether or not a particular client's consent is informed. *See Celgene Corp.*, 2008 WL 2937415, at *8 (July 29, 2008 D.N.J.).

The waiver language at issue in this case is found in V&E's 2003 engagement letter. First, the 2003 engagement letter identifies a course of conduct with regard to concurrent conflicts of interest. Second, the engagement letter includes an explanation of the material risk in waiving future conflicts of interest. Third, the letter explains an alternative course of conduct for Galderma. All of these favor a finding that Galderma's agreement manifested informed consent.

15

**First**, the Court examines the language for whether or not the parties agreed to a course of conduct with regard to conflicts of interest. The letter, in relevant part, states:

> We recognize that we shall be disqualified from representing any other client with interests materially and directly adverse to yours (i) in any matter which is substantially related to our representation of you and (ii) with respect to any matter where there is a reasonable probability that confidential information you furnished to us could be used to your disadvantage. You understand and agree that, with those exceptions, we are free to represent other clients, including clients whose interests may conflict with yours in litigation, business transactions, or other legal matters.

These sentences, the bulk of the waiver language, identify a course of conduct for the parties. The course of conduct identified is that V&E is given wide ranging freedom to represent other clients, including those whose interests conflict with Galderma. The outer boundaries of the parties agreed course of conduct is defined in the previous sentence. Despite V&E's freedom to represent other clients with conflicting interests, V&E would not be able to represent a client in a material and directly adverse manner where the adverse representation is substantially related to the representation of Galderma, or there is a reasonable probability that confidential information Galderma furnished could be used to its disadvantage. The course of conduct identified in the waiver language provides for broad freedom for V&E to represent clients with whom it would otherwise have a conflict of interest, limited by specifically identified situations.

Galderma argues the waiver is open-ended and vague, which makes it unenforceable. First, an open-ended waiver is not per se unenforceable. *See* MODEL RULES OF PROF'L CONDUCT R. 1.7, cmt. 22 (2010) (allowing for the validity of open-ended waivers). Second, simply because a waiver is general, does not mean it is vague. The waiver language in the contract signed by Galderma provides a framework for determining in the future, when a conflict arises, whether or not V&E will be disqualified.

Galderma maintains that the provisions of the waiver must be more specific so that a person who reads the waiver can know whether the parties anticipated a particular party or a particular type of legal matter. Naming a potential party and the nature of a future matter were requirements identified by the ABA Committee on Ethics prior to the 2002 amendments. ABA Formal Ethics Op. 93-372. The amendments, for the first time specifically included guidance on informed consent to future conflicts of interest. ABA Formal Ethics Op. 05-436. The 2002 amendments, which support the validity of general, open-ended waivers, permit informed consent to a wider range of future conflicts that would have been possible prior to the amendments. *Id.* Because the 2002 amendments changed the standard for when a client's waiver of future conflicts is effective, and in response to those changes, the ABA subsequently withdrew Formal Opinion 93-372, a lawyer is no longer required to meet the limitations established in ABA Formal Ethics Opinion 93-372 to obtain informed consent from all clients. *See* ABA Formal Op. 05-436. While specifying a

particular party or type of legal matter does make it more likely that the waiver will be effective for a wider range of clients, using a general framework for determining a course of conduct does not render the waiver unenforceable. The waiver language supports a finding of informed consent because it provides a course of conduct by which the parties can manage future conflicts relating to the attorney-client relationship.

**Second**, the Court looks to see whether or not the waiver language includes any explanation of the material risk of waiving future conflicts of interest. Waiver language that informs the client of the material risk of waiving future conflicts supports a finding of informed consent. *See* MODEL RULES OF PROF'L CONDUCT R. 1.0(e) (2010); *Celgene*, 2008 WL 2937415, at *8. V&E waiver language in this case informs Galderma that if they agree, Vinson and Elkins representation of Galderma, "will not prevent or disqualify us from representing clients adverse to you in other matters." The previous language explains that V&E is not necessarily disqualified when representing another client with interests "materially and directly adverse to [Galderma]." The waiver explains that agreeing to the waiver risks V&E advocating for another client directly against Galderma. This is exactly the risk of which Galderma now claims they were not informed. This language explains the material risk in waiving future conflicts, and so this language also supports a finding of informed consent.

**Third**, the Court looks to see whether the waiver language contains any explanation of reasonably available alternatives to the proposed course of conduct. When the waiver language includes explanation of alternatives to the course of conduct, this also supports a finding that the client gave informed consent. *See* MODEL RULES OF PROF'L CONDUCT R. 1.0 (e) (2010); *Celgene*, 2008 WL 2937415, at *8. In this case, the alternative course of conduct is for Galderma to hire other counsel. The waiver language tells Galderma, "You are free to retain any other counsel of your choosing." Elsewhere, the engagement letter tells Galderma that V&E's representation of Galderma is based on the parties' mutual consent. The language in the waiver and the agreement as a whole identifies at least one alternative; Galderma need not engage V&E on this matter if they do not wish to consent to the proposed terms and conditions. This language, although the least clear of the three factors, also supports a finding of informed consent.

Galderma largely relies on the rationale of the *Celgene* court to argue that the waiver language in this case is not reasonably adequate for a client to make an informed decision. The *Celgene* court considered similar waiver language in that case. *Id.* at *2. In holding that the waiver language was not reasonably adequate, the *Celgene* court reasoned that the attorneys seeking the waiver of future conflicts needed to further identify risks to Celgene, such as particularizing generic pharmaceutical companies as a potentially conflicted client and identifying patent disputes as a potential matter where the attorneys may represent a client with conflicting interests.

*Id.* at *8.  The court also reasoned that the attorneys needed to further explain alternatives such as defining substantially related matters or considering broader limitations such as refraining from representing all general drug companies.  *Id.*

While such language is even better evidence of a client giving informed consent, the Court disagrees with the *Celgene* Court that this type of language is always necessary to show informed consent.  The examples given by the *Celgene* court are all examples of ways in which attorneys may identify a particular party, class of parties, or the nature of the potentially conflicting future matter.  This type of language is not always necessary for a client to give informed consent, given the 2002 amendments to the Model Rules.  ABA Formal Op. 05-436.  If such language was always required, general and open-ended consent would never be valid.  *See id.*  To the contrary, the Committee recognized that under particular circumstances, general and open-ended consent is still likely to be valid.  *Id.*; MODEL RULES OF PROF'L CONDUCT R. 1.7, cmt. 22 (2010).

The Court concludes that the waiver in the 2003 engagement letter is reasonably adequate to allow clients in some circumstances to understand the material risk of waiving future conflicts of interest.  The language discloses a course of conduct for determining when V&E will be disqualified, explains the material risk that V&E may be directly adverse to the client, and explains an alternative, that the client need not hire V&E if it does not wish to consent.  The Court must next examine Galderma's sophistication and whether Galderma was independently

represented in the waiver to determine whether or not the disclosure provided was reasonably adequate to allow Galderma to understand the material risks of waiving future conflicts. *Id.* R. 1.0, cmt. 6 & R. 1.7, cmt. 22.

### 2. Whether V&E's Disclosure is Reasonably Adequate for Galderma to Form Informed Consent

For the general, open-ended waiver to be valid in this case, V&E must still establish that the disclosure was reasonably adequate to allow Galderma to understand the material risks involved. The communication necessary to obtain informed consent varies with the situation involved. *Id.* R. 1.0, cmt. 6. The principal considerations at this point in the analysis are the sophistication of the parties and whether the client was represented by counsel independent of the law firm seeking the waiver. *See* RESTATEMENT (THIRD) LAW GOVERNING LAWYERS § 122, cmt. c(i) (2000).

### a. The Client's Sophistication

The parties have disagreed sharply as to whether or not the client's sophistication is relevant to resolving this issue. Galderma argues that the sophistication of the client is not relevant, whereas V&E argues that a client's sophistication is a critical factor.

The Comments to the Model Rules and the ABA Committee on Ethics Opinions state that client sophistication is indeed relevant. A lawyer need not inform a client of facts or implications already known to the client. MODEL RULES OF PROF'L CONDUCT R. 1.0, cmt. 6 (2010); RESTATEMENT (THIRD) OF LAW GOVERNING

LAWYERS § 122, cmt. c(i) (2000). Thus, the client's existing knowledge affects whether the disclosure in a case is reasonably adequate. Additionally, a client is also sophisticated when "the client…is experienced in legal matters generally and in making decision of the type involved…." MODEL RULES OF PROF'L CONDUCT R. 1.0, cmt. 6 (2010). Normally, such persons need less information and explanation than others. *Id.* The comments to Model Rule 1.7, specifically dealing with conflicts of interest, also consider the knowledge and experience of the client in determining whether or not a client's consent is effective. *See* MODEL RULES OF PROF'L CONDUCT R. 1.7, cmt. 22 (2010). Since the addition of these Comments to the Model Rules, the Committee on Ethics has also changed its position, concluding that the effectiveness of client consent does vary with the client's level of sophistication. ABA Formal Op. 05-436 (withdrawing its prior Formal Op. 93-372 as now inconsistent with the Model Rules). Under the 2002 changes to the Model Rules, a sophisticated client need not be provided as much information for the disclosure to be reasonably adequate for the client to give informed consent.

Galderma is highly sophisticated client. Galderma describes itself as one of the world's leading dermatology companies. In 2011, Galderma and its affiliates reported worldwide sales of 1.4 billion euros, which is approximately 1.87 billion dollars. Galderma is involved in extensive research as part of its normal operations, having filed approximately 5,500 patent applications and patents. Galderma operates

worldwide with either R&D centers or manufacturing centers in France, Sweden, Canada, Brazil, Japan, and the United States.

Galderma is also sophisticated in its legal experience. Galderma is presently involved in approximately a dozen different lawsuits, many involving large, complex patent disputes. Galderma litigates in state and federal courts across the country, including Texas, New York, Massachusetts, Florida, Georgia, Illinois, Wisconsin, and Delaware. In doing so, Galderma routinely retains different, large law firms to advise the corporation on various matters across the country including, DLA Piper, Paul Hastings, and V&E. Galderma is experienced in retaining large, national law firms and has signed waivers of future conflicts as part of engaging a national law firm on at least two other occasions, including as recently as February of 2012. Quinton Cassady, who signed the 2003 V&E engagement letter, is the same person who signed engagement letters with DLA Piper which also contained waivers of future conflicts. In one case, Mr. Cassady even initialed the future conflicts waiver portion of an engagement letter. The record in this case demonstrates that Galderma is a client who is highly sophisticated in both legal matters generally and in making decisions to retain large, national firms. This level of sophistication weighs in favor of finding informed consent in this case.

Galderma relies on *Woolley v. Sweeney* to argue that that the Fifth Circuit requires the same full disclosure from an attorney regarding conflicts without regard to the client's sophistication. *See* No. 3:01-cv-1331, 2003 WL 21488411 (N.D. Tex.

23

May 13, 2003, Stickney, J.). *Woolley* is inapposite, however, as the case dealt with a conflict known to the attorneys at the time the client retained the attorneys and the attorneys sought the waiver. *See id.* at *1. If a conflict of interest is known to an attorney at the time he seeks a waiver, the attorney is not allowed to hide that conflict, regardless of whether the client is sophisticated or not. *See id.* But here, the attorney is not withholding information regarding a conflict of which the attorney is already aware.

Even if the holding in *Woolley* were applicable, the Court would still be compelled to hold that Galderma's sophistication and independent representation were factors in the informed consent decision. The precedent relied on by the court in *Woolley* predates the 2002 changes to the Model Rules. *See id.* at *6, 11 (citing *Horaist v. Doctor's Hosp. of Opelousas*, 255 F.3d 261, 268 (5th Cir. 2001) & *E.F. Hutton & Co., Inc. v. Brown*, 305 F. Supp. 371, 398 (S.D. Tex. 1969)). The Fifth Circuit's current framework establishes that the national standard guide the court's analysis, and that standard is determined by the current ABA Model Rules and related authority. *In re Dresser*, 972 F.2d 540, 541 (5th Cir. 1992).

### b.    Independent Counsel

Another related, but different factor the Court considers is whether the client is represented by independent counsel. A client represented by independent counsel needs less information and explanation than others for its consent to be informed. MODEL RULES OF PROF'L CONDUCT R. 1.0, cmt. 6 & R. 1.7, cmt. 22 (2010); ABA

Formal Op. 05-436. For the purposes of determining informed consent, the effect is the same whether that independent lawyer is inside the client's organization or is other, outside counsel. RESTATEMENT (THIRD) OF LAW GOVERNING LAWYERS, § 122, cmt. C(i) (2000). The importance of this factor is obvious. The ultimate test for determining whether a client gave informed consent is whether the disclosure is reasonably adequate to allow a client to understand the material risks involved. MODEL RULES OF PROF'L CONDUCT R. 1.0, cmt. 6 & R. 1.7, cmt. 22 (2010). When the client has the benefit of its own lawyer, who is bound by and familiar with the same ethical obligations of the lawyers seeking a waiver, less disclosure is needed to reveal to the independent counsel and its client the consequences of agreeing to the proposed waiver of future conflicts. Another lawyer, who is familiar with the ethical requirements of practicing law, is inherently more informed than even the most sophisticated lay person. The comments to the Model Rules reflect the importance of this factor, going so far as to say that "generally a client…who is independently represented by other counsel in giving the consent *should be assumed* to have given informed consent." *Id.* R. 1.0, cmt. 6 (emphasis added).

Galderma has its own legal department. Galderma has a general counsel with over 20 years of experience practicing law, who is a member of both the Texas state bar and the federal bar. Galderma relies on its general counsel, Mr. Cassady, and the corporate legal department to give competent legal advice pertaining to complex legal matters. Mr. Cassady, as an inside counsel, is still lawyer *independent* from V&E,

advising Galderma on whether or not Galderma should give its consent.  *See*
RESTATEMENT (THIRD) OF LAW GOVERNING LAWYERS, § 122, cmt. C(i) (2000).

Mr. Cassady claims now that he did not intend to consent to V&E
representing a generic drug manufacturer when he signed the 2003 engagement letter.
The language in the Model Rules is clear; informed consent turns on an objective
standard of reasonable disclosure and reasonable understanding.  *See* MODEL RULES
OF PROF'L CONDUCT R. 1.0 & 1.7 (2010).  Mr. Cassady's current declaration that he
did not actually intend for Galderma to consent does make a general waiver invalid
because when a sophisticated party is represented by independent counsel a general,
open-ended waiver is still likely to be reasonably adequate disclosure.

Galderma argues that existing case law holds that even a sophisticated client,
represented by its own independent counsel cannot give informed consent based on
general, open-ended waiver language.  The national standard set by the ABA Model
Rules and the Restatement (Third) of the Law Governing Lawyers do not take such a
position, and the cases cited by Galderma are distinguishable in critical ways.

Galderma argues that the rationale of a pair of cases out of California
persuasively demonstrate why V&E's waiver language is not sufficient for a client to
form informed consent.  *See Visa U.S.A., Inc. v. First Data Corp.*, 241 F. Supp.2d 1100
(N.D. Cal. 2003); *Concat, L.P. v. Unilever, P.L.C.*, 350 F. Supp.2d 769 (N.D. Cal.
2004).  Galderma's reliance is misplaced for several reasons.  First, the *Concat* court
relying on *Visa U.S.A.*, held that to obtain informed consent, the prospective waiver

must disclose the nature of the subsequent conflict.  *Concat, L.P.*, 350 F. Supp.2d at 820.  There is no requirement under the current Model Rules that all prospective waivers must disclose a specific nature of a subsequent conflict to be valid.  *See* MODEL RULES OF PROF'L CONDUCT R. 1.7 (2010).

Second, the *Concat* court found that the waiver language was not sufficient to form informed consent, because it did not name a specific party like the advance waiver in *Visa U.S.A., Inc.  See Concat* 350 F. Supp.2d at 821.  The *Visa U.S.A., Inc.* court relied, in part, on Formal Opinion 93-372, which stated that the closer the lawyer who seeks a prospective waiver can get to circumstances where not only the actual adverse client but also the actual potential future dispute is identified, the more likely the prospective waiver is ethically permissible.  *Visa U.S.A., Inc.*, 241 F.Supp.2d at 1107.  While still true, a disclosure, identifying a particular client no longer a requirement for every client to form informed consent.  *See* ABA Formal Op. 05-436 (withdrawing and expanding on ABA Formal Op. 93-372).  Critically, nothing in either case suggests the courts examined the national standard for informed consent in light of the changes to the Model Rules and the new comments, on which the parties have focused in this case.  Because of that court's reliance on ABA Formal Opinion 93-372, which the ABA has since withdrawn, and because ABA Formal Opinion 05-436 expanded the situations for which a waiver provides a basis for informed consent, the difference between *Visa* and *Concat* is no longer persuasive for whether a particular waiver is insufficient to form the basis of informed consent.

*See* ABA Formal Op. 05-436 (stating that Opinion 93-372 concludes informed consent is limited to circumstances in which the lawyer is able to and does identify the potential party or class of parties that may be represented in the future matter(s), and Opinion 93-372 is no longer consistent with the Model Rules).

Galderma also relies heavily on the rationale in *Celgene Corp. v. KV Pharmaceutical Co.*, where the court concluded that the general open-ended waiver language was not sufficient to show the lawyers seeking a waiver obtained informed consent. *See* 2008 WL 2937415, at *12 (July 29, 2008, D.N.J.). Both the law and the rationale of the *Celgene* court are distinguishable.

As to the law, the *Celgene* court considered itself bound by Third Circuit and New Jersey Supreme Court precedent which differs from the national standard because the precedent incorporated New Jersey state rules, which elucidate a different, more stringent standard. *See In re Congoleum Corp.* 426 F.3d 675 (3rd Cir. 2005). Under New Jersey rules the test for informed consent is whether the attorney provided both "full disclosure and consultation." *See id.* at *4 (discussing *In re Congoleum Corp.*, 426 F.3d 675 (3d Cir. 2005)). To meet the "consultation" part of the test under New Jersey law, the Third Circuit concluded that, an attorney should have to first indicate in specific detail all of the areas of potential conflict that foreseeably might arise. *In re Congoleum*, 426 F.3d at 691. Bound by precedent, the *Celgene* court could not find Celgene had given informed consent unless the lawyers seeking the waiver told Celgene of specific implications and the specific possibility

that the lawyers might represented a generic pharmaceutical company in future patent litigation. *Celgene*, 2008 WL 2937415, at*11.

In the Fifth Circuit, the Model Rules, are the primary source of guidance for this Court, and the test for informed consent is whether the client understands the material risks involved in waiving the future conflict. MODEL RULES OF PROF'L CONDUCT R. 1.0 (e) & 1.7, cmt. 22 (2010). Additional consultation outside of the waiver is not a requirement to obtain informed consent. A lawyer need not inform the client through additional consultation of facts or implications already known to the client. *Id.* 1.0, cmt. 6; RESTATEMENT (THIRD) LAW GOVERNING LAWYERS § 122, cmt. c(i)(2000). Accordingly, under the national standard, as opposed to the New Jersey standard, additional consultation is not required for a client to give informed consent when, without it, the client is aware of sufficient information reasonably adequate to make an informed decision. MODEL RULES OF PROF'L CONDUCT R. 1.0, cmt. 6 (2010); RESTATEMENT (THIRD) LAW GOVERNING LAWYERS § 122, cmt. c(i) (2000).

The Court also disagrees with The *Celgene* court's analysis regarding the role of independent counsel in determining whether a client gave informed consent. *See Celgene*, 2008 WL 2937415, at *9–10. The *Celgene* court acknowledged Comment 22 to Model Rule 1.7 and ABA Formal Opinion 05-436, but determined that these authorities merely acknowledged that a consent that is otherwise "informed, but general is likely to be valid if the client was represented by independent counsel in

29

the waiver transaction." *Id.* at 10.  The court concluded that using independent

counsel was not relevant to whether or not a client's consent is informed.  *Id.*

Comment 22 to Model Rule 1.7, Comment Six to Model Rule 1.0, ABA

Formal Opinion 05-436, and Section 122 of the Restatement (Third) of Law

Governing Lawyers all incorporate independent counsel as an important factor to

determine whether or not a client gave informed consent.  Comment Six explains, in

determining whether the information and explanation provided are reasonably

adequate, relevant factors include whether the client is independently represented by

other counsel in giving the consent.  MODEL RULES OF PROF'L CONDUCT R. 1.0, cmt.

6 (2010).  When a client has their own lawyer who reviews the waiver, the client does

not need the same type of explanation from the lawyer seeking a waiver because the

client's own lawyer can review what the language of the waiver plainly says and advise

the client accordingly.  The court cannot agree with the *Celgene* court because to do so

would ignore the knowledge and advantage that clients gain by employing their own

counsel to advise them, and the national ethical standards clearly compel the court to

consider a client's use of independent counsel.

> ### 3.    Whether Galderma Gave Informed Consent to the Waiver of Future Conflicts of Interest

V&E's disclosure is general and open-ended.  In many cases, and for many

clients, the disclosure in this case would likely not be reasonably adequate to allow a

client to make an informed decision.  Even though general, the disclosure language

does lay out a course of action for when V&E would be disqualified for a conflict of

interest and when not.  The disclosure warns in plain language that Galderma's consent means V&E may appear directly adverse to Galderma in litigation, the very risk of which Galderma now claims they were not made aware.  Galderma is a sophisticated client who has experience engaging multiple large law firms and has twice signed similar waiver provisions with at least one other law firm it has hired. Finally, having the benefit of its own independent counsel to advise Galderma on what the language meant, Galderma, through its own counsel, chose to sign the engagement letter which included the waiver of future conflicts.

Given the 2002 amendment to the Model Rules on informed consent and waivers of future conflicts, the authority related to those changes, and the evidence in this case, the Court concludes that Galderma gave informed consent to V&E's representation of clients directly adverse to Galderma in substantially unrelated litigation.  Because V&E's representation of Actavis falls within the scope of that informed consent, V&E is not disqualified from representing Actavis.

III.    **Conclusion**

Galderma gave informed consent for V&E to represent other clients in litigation directly adverse to Galderma, subject to the limitations specifically identified in the waiver language.  V&E's representation of Actavis falls within the scope of that informed consent.  Therefore, V&E's representation of Actavis is not a

violation of ethical standards, and disqualification is not warranted.

SO ORDERED.

SIGNED on February 21st, 2013.

_Ed Kinkeade_

ED KINKEADE
UNITED STATES DISTRICT JUDGE